UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
———————————————————————

UNITED STATES OF AMERICA,

                              Plaintiff,

          v.

MATTHEW D. LINCOLN,

                        Defendant.

———————————————————————

DECISION & ORDER and
REPORT & RECOMMENDATION

19-CR-6047CJS

**PRELIMINARY STATEMENT**

By Order of Hon. Charles J. Siragusa, United States District Judge, dated March 29, 2019, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B). (Docket # 34).

Defendant Matthew D. Lincoln ("Lincoln") has been charged in a single count indictment with using facilities and means of interstate and foreign commerce from on or about February 1, 2018 through February 15, 2018, to knowingly attempt to persuade, induce, entice, and coerce an individual under the age of 18 years to engage in sexual activity for which a person could be charged with a criminal offense, in violation of 18 U.S.C. § 2422(b). (Docket # 33). Currently pending before this Court for report and recommendation is Lincoln's motion to dismiss the indictment and to suppress statements. (Docket ## 43, 48). Also pending before this Court is Lincoln's motion for disclosure of grand jury materials.[1] (Docket # 43). For the reasons

---

[1] Lincoln's omnibus motion also sought, *inter alia*, *Brady* material, discovery and inspection, evidentiary rulings pursuant to Rules 404(b), 608 and 609, *Jencks* materials, preservation of rough notes, suppression of tangible evidence, and leave to file additional motions. (Docket # 43). Each of these requests was either resolved by the parties or decided in open court by the undersigned on August 14, 2019. (Docket ## 45, 46).

discussed below, I deny Lincoln's request for grand jury materials and recommend that the district court deny Lincoln's motions to dismiss and to suppress statements.

## REPORT & RECOMMENDATION

### I.    Motion to Dismiss Indictment for Insufficiency

The felony charge against Lincoln stems from communications he allegedly had with an undercover agent posing as a sixteen-year-old girl named "Ally."  (Docket # 4 at ¶ 5).  According to the complaint, after engaging in sexually explicit text-message conversations with "Ally" over the course of fifteen days, Lincoln proposed that they meet in person.  (*Id.* at ¶¶ 6-11).  They allegedly made arrangements to meet on February 15, 2018 at a local diner, and Lincoln was arrested in the parking lot of the diner and subsequently charged with a violation of 18 U.S.C. § 2422(b) ("Section 2422(b)"), which prohibits the use of instrumentalities of interstate commerce to entice or attempt to entice a minor to engage in unlawful sexual activity.  (*Id.* at ¶¶ 11-12).

According to the government, Lincoln violated Section 2422(b) because he, an individual older than twenty-one, used a means of interstate commerce – his cell phone and the internet – in an attempt to persuade "Ally," an individual whom he believed was sixteen, to engage in sexual intercourse with him.  (*Id.* at ¶¶ 14-16; Docket # 33).  Specifically, the government maintains that the sexual activity that Lincoln sought to persuade Ally to engage in with him would have constituted Rape in the Third Degree, in violation of New York Penal Law

2

Section 130.25(2), which prohibits a person over twenty-one from engaging in sexual intercourse with a person under seventeen.[2]  (Docket # 4 at ¶ 14).

Lincoln seeks dismissal of the indictment on several grounds.  (Docket # 43-1).  First, Lincoln maintains that the term "criminal offense" in Section 2422(b) may not be interpreted to include state law crimes.  (*Id.* at ¶¶ 25-48).  Next, Lincoln argues that Section 2422(b), if it were interpreted to incorporate state law crimes, would be unconstitutionally vague because it would permit incorporation of conflicting laws from different jurisdictions.  (*Id.* at ¶¶ 49-64).  Lincoln further contends that Section 2422(b) is unconstitutionally vague as applied to him because the fictional minor "Ally" was sixteen – younger than the age of consent in New York's statutory rape law, but older than the age of consent in neighboring state and federal territorial statutory rape laws.  (*Id.* at ¶¶ 65-74).  Finally, Lincoln maintains that the indictment should be dismissed as the product of selective and vindictive prosecution.  (*Id.* at ¶¶ 75-101).  The government counters that none of the arguments advanced by Lincoln compels dismissal.  (Docket ## 44, 55).

### A.    **"Criminal Offense" under Section 2422(b)**

Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, a party may move to dismiss for a "defect in the indictment or information, including: . . . failure to state an offense."  Fed. R. Crim. P. 12(b)(3)(B)(v); *see United States v. Laurent*, 861 F. Supp. 2d 71, 109 (E.D.N.Y. 2011) ("[a] trial court may dismiss an indictment that does not state an offense under

---

[2]  In relevant part, the statute provides:

A person is guilty of rape in the third degree when:

2.    Being twenty-one years old or more, he or she engages in sexual intercourse with another person less than seventeen years old.

N.Y. Penal Law § 130.25(2).

the charged statute").  Challenges to the sufficiency of an indictment "often turn on the meaning

of a statutory term," *see United States v. Laurent*, 861 F. Supp. 2d at 109 – in this case, the term

"criminal offense."

> Section 2422(b) provides:
>
> Whoever, using . . . any facility or means of interstate or foreign
> commerce, . . . knowingly persuades, induces, entices, or coerces
> any individual who has not attained the age of 18 years, to engage
> in prostitution or any sexual activity for which any person can be
> charged with a criminal offense, or attempts to do so, shall be fined
> under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2422(b).

Lincoln contends that the indictment against him is defective because the sexual

activity at issue in the indictment constitutes a "criminal offense" only under state law, but not

under federal law.  (Docket ## 43-1 at ¶¶ 25-48; 53 at ¶¶ 13-43).  According to Lincoln, the term

"criminal offense" as used in Section 2422(b) must be interpreted to encompass only conduct

that would constitute a federal offense.  (*Id.*).

Relying heavily on the "presumption" recognized in *Jerome v. United States*, 318

U.S. 101 (1943), Lincoln maintains that if Congress had intended Section 2422(b) to reach

conduct unlawful under state law, it would have provided so explicitly.  (Docket ## 43-1 at

¶¶ 25-48; 53 at ¶¶ 13-34).  Additionally, Lincoln maintains that his position that "criminal

offense" excludes activity that is proscribed by state law but not federal law is supported by

examination of various other offenses under Title 18, including 18 U.S.C. §§ 2243 and 2427, as

well as by the categorical approach applied to state criminal convictions in the context of federal

sentencing.  (Docket # 43-1 at ¶¶ 29-47).  Lincoln also urges that incorporation of the state

offense that the government has identified as the statutory predicate in this case – New York

Penal Law Section 130.25(2) –would conflict with federal law and thus implicate the Supremacy Clause.  (Docket # 53 at ¶¶ 35-43).

Having carefully reviewed the statutory language of Section 2422(b), its relevant legislative history, and pertinent caselaw, I conclude that Section 2422(b) permissibly incorporates state sexual offenses.  Lincoln is correct that "in the absence of a plain indication to the contrary," a court must generally assume that "Congress when it enacts a statute is not making application of the federal act dependent on state law," *Jerome v. United States*, 318 U.S. at 104; in this case, however, there is a "plain indication to the contrary," namely, the legislative history of Section 2422(b), *see Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 116 (2d Cir. 2007) ("[i]f the statutory language is ambiguous, however, we will resort first to canons of statutory construction, and, if the statutory meaning remains ambiguous, to legislative history") (internal quotations and brackets omitted).

Congress enacted the original version of the Mann Act in 1910 with the purpose of "put[ting] a stop to a villainous interstate and international traffic in women and girls." *United States v. Durham*, 902 F.3d 1180, 1195 (10th Cir. 2018) (quoting H.R. Rep. No. 61-47, at 9 (1909)), *cert. denied*, 139 S. Ct. 849 (2019).  The Act, which was amended various times over the years, was amended in 1986 "to eliminate its anachronistic features and to make it gender neutral."  *See* H.R. Rep. No. 99-910, at 3 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5952, 5953; *see also* H.R. 5560, Pub. L. 99-628, § 5, 100 Stat. 3510 (1986).  The anachronistic features included language proscribing the interstate transportation (or enticement thereof) of women and girls for prostitution or "for any other immoral purpose."  *United States v. Durham*, 902 F.3d at 1194; H.R. Rep. No. 99-910, at 8.

Pursuant to the 1986 amendments, the provision "for any other immoral purpose" contained in earlier versions of Sections 2421, 2422, and 2423 was replaced with a "more precise standard," namely, "with intent that such individual engage in . . . any sexual activity for which any person can be charged with a criminal offense."[3]  *See* H.R. Rep. No. 99-910, at 8. Significantly, the House Committee on the Judiciary's report on the bill states, "[u]nder this language, the offense is transporting any person for illegal sexual activity *under any applicable law – Federal, State or local*."  *Id.* (emphasis added).  Although the statement refers directly to the transportation provision of the Mann Act, Section 2421, the new language was also added to Section 2422, the statute at issue here.  (*Id.*).  The House Judiciary Committee Report further indicates that the amended provision "reflects a proper recognition of community standards regarding acceptable sexual behavior, in that Federal law would, in effect, *apply those standards*."  *Id.* (emphasis added).

In other words, unlike the legislative history of the criminal statute at issue in *Jerome*, the legislative history of Section 2422 explicitly affirms Congress's intent to include state law offenses within the term "any sexual activity for which any person can be charged with a criminal offense."  Indeed, as the Supreme Court recognized in *Jerome*, the legislative history

---

[3]  Subsection (b) of Section 2422 was not enacted until February 8, 1996.  *See* Pub. L. 104-104, § 508, 110 Stat. 56 (1996).  At that time, the text of the subsection provided:

> Whoever, using any facility or means of interstate or foreign commerce, including the mail, or within the special maritime and territorial jurisdiction of the United States, knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years to engage in prostitution or any sexual act for which any person may be criminally prosecuted, or attempts to do so, shall be fined under this title or imprisoned not more than 10 years, or both."

*See* Pub. L. 104-104, § 508.  On October 30, 1998, the phrase "any sexual act for which any person may be criminally prosecuted" was amended to its current version, "any sexual activity for which any person can be charged with a criminal offense," which mirrors the language of 18 U.S.C. §§ 2421, 2422(a), 2423 and 2425.  *See* Pub. L. 105-314, § 102, 112 Stat. 2974 (1998).

of the statute before it contained indications of Congress's intent "to the contrary"; specifically, that history revealed that Congress had rejected provisions which would have "ma[de] state felonies federal offenses." *Jerome*, 318 U.S. at 105-06. These material differences in the legislative histories, in my estimation, render the *Jerome* presumption inapplicable in this case. *See United States v. Rogers*, 2019 WL 2435758, *2 (D. Kan. 2019) ("the [c]ourt is not persuaded that it must construe § 2422(b) to only incorporate federal criminal offenses based on *Jerome*," noting that the challenged phrase is "not preceded by a federal crime but a state or local crime, i.e., prostitution"); *United States v. Lanzon*, 2008 WL 3271092, *6-7 (S.D. Fla. 2008) ("[w]hile logical on its face, defendant's argument [invoking *Jerome*] cites no federal cases construing § 2422(b) to preclude the use of state law as the underlying 'criminal offense'[;] . . . given the clear intent of this statute . . . , the only logical choice of law to apply in the [indictment] is Florida state law").[4]

In sum, based upon the relevant language and legislative history, I find that Section 2422(b) permissibly incorporates state law offenses. *See United States v. Whisman*, 757 F. App'x 391, 392 (5th Cir. 2019) (per curiam) (court did not commit plain error in determining that § 2422(b) incorporates state law; "[defendant] cites no authority from this, or any other, circuit interpreting § 2422(b) to require the putative offense be federal in nature"); *United States v. Dwinells*, 508 F.3d 63, 72 (1st Cir. 2007) ("Section 2422(b) criminalizes the enticement of minors into 'criminal offense[s]' of a sexual nature, but the statute is silent as to which sovereign's law defines those offenses[;] [t]he decided cases fill this gap; they indicate that such

---

[4] Indeed, as recognized by the government, the fact that the statutory language of Section 2422(b) refers to an individual "who has not attained the age of 18 years" rather than 16 years – the federal age of consent – further supports the conclusion that Section 2422(b) was intended to incorporate state law. *Compare* 18 U.S.C. § 2422(b) *with* 18 U.S.C. § 2243(a).

7

offenses may be defined by the laws of any of the several states") (collecting cases), *cert. denied*, 554 U.S. 922 (2008); *United States v. Rogers*, 2019 WL 2435758 at *3 ("the [c]ourt is not persuaded that the phrase 'any sexual activity for which any person can be charged with a criminal offense' in § 2422(b) only incorporates federal offenses and not state law ones[;] . . . when courts have interpreted this statute in the context of a constitutional challenge, they have held, and sometimes simply assumed, that state law offenses are incorporated"); *United States v. Anderson*, 2013 WL 4544044, *4 (D. Ariz. 2013) (interpreting same language in Section 2423(a) and concluding Congress intended to incorporate state law offenses);[5] *United States v. Lanzon*, 2008 WL 3271092 at *7 ("[f]inding no contrary authority interpreting § 2422(b), the undersigned concludes that a violation of § 2422(b) can and frequently does incorporate a violation of state law"); *see also United States v. Gordon*, 713 F. App'x 424, 429 (6th Cir. 2017) ("[a]n individual is still on notice that if he transports a minor with the intent that the minor engage in prostitution or criminal sexual activity, whether under state or federal law – he has violated § 2423(a)"); *United States v. Korfhage*, 683 F. App'x 888, 891 (11th Cir.) (per curiam) (affirming conviction under 18 U.S.C. § 2422(b) based upon state law violation), *cert. denied*, 138 S. Ct. 205 (2017); *United States v. Shill*, 740 F.3d 1347, 1352 (9th Cir.) (finding that Congress intended Section 2422(b) "to apply to both state felony and misdemeanor conduct"), *cert. denied*, 574 U.S. 858 (2014); *United States v. Deal*, 438 F. App'x 807, 810 (11th Cir. 2011) (per curiam) (affirming enticement conviction under Section 2422(b) based upon state law violation); *United States v. Patten*, 397 F.3d 1100, 1103 (8th Cir. 2005) (same); *United States v. Dhingra*, 371 F.3d 557, 564-65 (9th Cir. 2004) (same); *United States v. Panfil*, 338 F.3d 1299, 1301 & n.2 (11th

---

[5]  Section 2423(a) at issue in *United States v. Anderson*, 2013 WL 4544044, contains the same language challenged here.

Cir. 2003) (same); *United States v. Doak*, 2019 WL 2163612, *1 (S.D. Ala. 2019) ("[t]he criminal offense with which any person can be charged has been held to refer to state or federal law") (internal quotations omitted);*United States v. Kaye*, 451 F. Supp. 2d 775, 786 (E.D. Va. 2006) ("the inquiry becomes whether engaging in sexual activity with a thirteen-year-old boy is an act that can be charged as a crime[;] . . . [t]his includes state sexual offenses"); *United States v. McDarrah*, 2006 WL 1997638, *6 (S.D.N.Y. 2006) ("[p]roperly read, § 2422 requires that if committed, the sexual activity must be a crime under state law[;] [o]ther courts have come to the same, common sense conclusion [that] liability under § 2422(b) is contingent on criminal sexual activity as defined by another statute") (internal quotations omitted).[6]

I also reject Lincoln's contention that there exists a "secondary fatal defect" in the interpretation of Section 2422(b) to reach state offenses, namely, that the incorporation of New York's statutory rape offense into Section 2422(b) would result in an impermissible conflict between state and federal law by expanding the age of consent under federal law from sixteen (as reflected in 18 U.S.C. § 2243, which applies to federal territorial jurisdiction) to seventeen (as reflected in under New York Penal Law Section 130.25(2)).  (Docket ## 43-1 at ¶¶ 31-32; 53 at ¶¶ 35-43).  Section 2422(b) does not criminalize statutory rape; rather, it proscribes *the use of facilities or means of interstate commerce to entice* any person under eighteen to engage in sexual activity for which any person may be charged with a criminal offense.  *See United States v. Brand*, 467 F.3d 179, 202 (2d Cir. 2006) ("[a] conviction under § 2422(b) requires a finding

---

[6]  I have considered Lincoln's remaining contentions, including that consideration of other provisions of Title 18 and treatment of state convictions for federal sentencing purposes urges a contrary interpretation of Section 2422(b), but in view of Congress's clear intent to incorporate state law offenses into Section 2422(b), I do not find these contentions persuasive.  *See* Docket ## 43-1 at ¶¶ 29-48 (citing 18 U.S.C. §§ 2243, 2427, 3559 and *Esquivel-Quintana v. Sessions*, 137 S. Ct. 1562 (2017)); 53 at ¶¶ 25-26 (citing *United States v. Townsend*, 897 F.3d 66 (2d Cir. 2018)).

only of an attempt to entice or an intent to entice, and not an intent to perform the sexual act

following the persuasion"), *cert. denied*, 550 U.S. 926 (2007); *United States v. Kufrovich*, 997

F. Supp. 246, 257 (D. Conn. 1997) ("Section 2422(b) criminalizes the use of a means of

interstate commerce[;] . . . [i]t is the use of a means of interstate commerce knowingly to

persuade or to attempt to persuade a minor to engage in unlawful sex that is the crime[;] [b]y the

terms of the statute the sexual act need never have actually occurred"), *rejected on other*

*grounds*, *United States v. Griffith*, 284 F.3d 338 (2d Cir.), *cert. denied*, 537 U.S. 986 (2002).

The two statutes prohibit different conduct and thus do not conflict.[7]  *See United States v.*

*Anderson*, 2013 WL 4544044 at *3 (rejecting defendant's argument that state offense should not

be incorporated into Section 2423(a) "because a federal statute, 18 U.S.C. § 2243, covers the

same sexual acts with a minor, and there is a strong federal interest in promotion the uniform

application of federal law"; . . . [d]efendant is not being prosecuted for violating state law")

(internal quotation omitted).[8]

**B.    Vagueness**

I next address Lincoln's contention that Section 2422(b), if interpreted to

incorporate state law offenses, is unconstitutionally vague on its face and as applied to Lincoln.

(Docket # 43-1 at ¶¶ 49-74).  According to Lincoln, the statute is defectively vague because

persons subject to prosecution under it cannot be certain which "potentially conflicting state and

local laws" would apply to their conduct since the age of lawful consent varies between states.

---

[7]  For similar reasons, any Tenth Amendment challenge that Lincoln may raise (Docket # 43-1 at ¶ 68) is also rejected.  *See United States v. Dhingra*, 371 F.3d at 564 ("because a [Section] 2422(b) violation is its own offense subject to prosecution independent of other underlying offenses, the state's power to prosecute criminal sexual conduct under state law is in no way abrogated").

[8]  The court in *Anderson* also found that "[d]efendant's reliance on the [Assimilative Crimes Act ("ACA")] is misplaced."  *Id.*  For the same reasons noted in *Anderson*, Lincoln's reliance on the ACA in support of his motion (*see* Docket # 53 at ¶¶ 37-43) is likewise misplaced.

10

(*Id.* at ¶ 63).  In this case, the fictional minor with whom Lincoln allegedly communicated was sixteen, making her younger than the legal age of consent in New York, but older than the legal age of consent in other states.  (*Id.* at ¶ 67).

To avoid being unconstitutionally vague, a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (collecting cases); *Patrick Carter Assocs., Inc. v. Rent Stabilization Ass'n of N.Y.C., Inc.*, 781 F. Supp. 207, 218 (S.D.N.Y. 1991) ("[t]he standard used in examining a statute for unconstitutional vagueness is whether a person of ordinary intelligence could not reasonably understand that the contemplated conduct would be proscribed by the statute").  In addition, "vagueness challenges to statutes [like the one at bar] which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Powell*, 423 U.S. 87, 92 (1975) (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)).  Thus, to the extent that Lincoln asserts a facial challenge to Section 2422(b), "th[e] challenge[] [is] rejected." *United States v. Wei*, 862 F. Supp. 1129, 1138 (S.D.N.Y. 1994); *see United States v. McDarrah*, 2006 WL 1997638 at *6 ("vagueness challenges that do not involve the First Amendment must be examined in light of the specific facts of the case at hand [and] not with regard to the statute's facial validity") (quotations omitted).

Turning to the as applied challenge, it rests on a similar proposition – that Section 2422(b)'s incorporation of varying state laws failed to provide Lincoln with adequate notice of what conduct is prohibited under the statute.  (Docket # 43-1 at ¶¶ 49-74).  That a federal criminal statute incorporates state law does not make it vague. *United States v. Korfhage*, 683

11

F. App'x at 891 (rejecting argument that "2422(b) is vague because the age of consent varies

from state to state"; "[t]he provision is no more vague than state boundary lines, which is to say

not at all"); *United States v. Deal*, 438 F. App'x at 810 ("[defendant] contends that the statute is

vague because it incorporates the laws of the 50 states, which vary with regard to what qualifies

as prohibited 'sexual activity,' but the statute is not unconstitutional because it references

different state laws"); *Dhingra*, 371 F.3d at 564 ("[t]hat the persuasion of others for sexual

activity occurs over the Internet offers no talismanic protection from the established rule that the

burden of complying with the statute rests with the person doing the persuading[;] . . . [t]he fact

that various community standards might apply does not make the statute unconstitutional");

*Anderson*, 2013 WL 4544044 at *5 ("a statute is not unconstitutionally vague merely because it

incorporates other provisions by reference; a reasonable person of ordinary intelligence would

consult the incorporated provisions"); *Lanzon*, 2008 WL 3271092 at *7 ("the undersigned finds

no violation of constitutional or other law simply because an incorporation of state law may

result in minor differences in application in other states"); *see also United States v. Tripp*, 782

F.2d 38, 42 (6th Cir.) ("[n]or is there any constitutional objection to a criminal statute that

incorporates state law for purposes of defining illegal conduct[;] . . . [t]hat is true even if the

result is that conduct that is lawful under the federal statute in one state is unlawful in another")

(internal citations omitted), *cert. denied*, 475 U.S. 1128 (1986).  Moreover, Lincoln does not

contend that the state criminal offense that underlies his federal prosecution, New York Penal

Law Section 130.25(2), is itself impermissibly vague.  *See*, *e.g.*, *United States v. Tripp*, 782 F.2d

at 42 (rejecting vagueness challenge to RICO statute because it incorporates state law offenses;

"[defendant] does not allege that the state offenses involved herein themselves are

'void-for-vagueness'[;] [i]n the absence of elucidation regarding the specific infirmities in the

statute, we find no cause to depart from precedent, and find that the statute, in light of the underlying state offenses, gives sufficient notice of the conduct proscribed); *United States v. Young & Rubicam, Inc.*, 741 F. Supp. 334, 342 (D. Conn. 1990) (same; "[defendant] does not claim that [the New York State Penal Law offenses] are unconstitutionally vague"). Beyond noting that the age of consent in the New York statutory rape law differs from the age of consent in comparable statutes in other states, Lincoln has not alleged how he – an individual who apparently resided in New York and allegedly attempted to induce another person residing in New York, who was under the age of consent in New York, to meet him in New York – did not have fair notice that his conduct was proscribed by Section 2422(b).

In sum, I find that Section 2422(b) is not unconstitutionally vague as applied to Lincoln. *See, e.g.*, *Korfhage*, 683 F. App'x at 891 (rejecting vagueness challenge to Section 2422(b) based upon incorporation of state law); *Deal*, 438 F. App'x at 810 (same); *Dhingra*, 371 F.3d at 564 (same); *McDarrah*, 2006 WL 1997638 at *6-7 ("[t]he sexual acts [alleged to have been encouraged by the defendant] are prohibited by New York State Penal Law[;] . . . [g]iven the allegations, § 2422(b) gives a person of ordinary intelligence reasonable opportunity to know that the charged conduct . . . [is] deemed criminal in the State of New York and therefore prohibited by federal law").

**C.**   **Selective/Vindictive Prosecution**

Finally, I turn to Lincoln's contention that the indictment should be dismissed on the grounds of selective or vindictive prosecution. (Docket # 43-1 at ¶¶ 75-101). As an initial matter, I agree with the government that Lincoln has failed to allege the elements necessary to a claim for selective prosecution. (Docket # 44 at 15-16 (quoting *United States v. Murph*, 452 F. App'x 31, 33 (2d Cir. 2011) (summary order) ("to succeed on an allegation of selective

prosecution, [defendant] must show both that the decision to prosecute him was based on his race, religion, or the desire to prevent him from exercising his constitutional rights, and that other similarly situated individuals suspected of conduct of a similar type have not been prosecuted"), *cert. denied*, 566 U.S. 980 (2012)).  Lincoln's only argument in support of dismissal on the grounds of selective prosecution is that he is being prosecuted for conduct that is not criminal under federal law or the laws of neighboring states.  (Docket # 43-1 at ¶¶ 76-80).  Nowhere does he assert that the decision to prosecute him is based upon his race, religion, or to prevent him from exercising a constitutional right.  Further, as the government notes, Lincoln himself asserts that the United States Attorney's Office "routinely" initiates prosecutions pursuant to Section 2422(b) based upon conduct criminalized by state penal codes.  (Docket # 44 at 15-16 (citing Docket # 43-1 at ¶ 26)).

        With respect to the claim of vindictive prosecution, the government has broad discretion in making charging decisions, *Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978); *United States v. White*, 972 F.2d 16, 18 (2d Cir.), *cert. denied*, 506 U.S. 1026 (1992), and an indictment will not be dismissed for vindictive prosecution unless there is "a finding of 'actual' vindictiveness."[9]  *United States v. Sanders*, 211 F.3d at 716 (quoting *United States v. Johnson*, 171 F.3d at 140).  Actual vindictiveness may be established by demonstrating that "(1) the prosecutor harbored genuine animus toward the defendant, or was prevailed upon to bring the charges by another with animus such that the prosecutor could be considered a 'stalking horse'

---

[9]  Dismissal may also be appropriate based upon a showing of  "a presumption of vindictiveness that has not been rebutted by objective evidence justifying the prosecutor's action."  *See United States v. Sanders*, 211 F.3d 711, 716 (2d Cir.) (quoting *United States v. Johnson*, 171 F.3d 139, 140 (2d Cir. 1999)), *cert. denied*, 531 U.S. 1015 (2000).  However, Lincoln "does not appear to base his claim on a presumption of vindictiveness, nor could he do so, inasmuch as [the Second Circuit] ha[s] 'consistently adhered to the principle that the presumption of prosecutorial vindictiveness does not exist in a pretrial setting.'"  *United States v. Bout*, 731 F.3d 233, 238 n.5 (2d Cir. 2013) (quoting *United States v. Stewart*, 590 F.3d 93, 122 (2d Cir. 2009), *cert. denied*, 559 U.S. 1031 (2010)).

and (2) the defendant would not have been prosecuted except for the animus." *United States v. Bout*, 731 F.3d at 238 (quotation citations and emphasis omitted).

Lincoln's contention that he is a subject of vindictive prosecution rests primarily on the government's alleged "early decision to prosecute this matter," pretrial public statements made by the United States Attorney, alleged misrepresentations made during the detention hearing, and the failure of the government to extend any plea offers that avoid sex offender registration or the ten-year mandatory minimum sentence. (Docket # 43-1 at ¶¶ 81-101). None of these allegations demonstrates animus on the part of the government, let alone that animus was the reason Lincoln was charged. *See Bout*, 731 F.3d at 239 ("[t]he government's enthusiastic or energetic pursuit of [defendant] . . . does not demonstrate vindictive, or even inappropriate, government conduct"); *United States v. Bailey*, 2016 WL 6995067, *37 (W.D.N.Y. 2016) ("[a] presumption of vindictiveness does not arise during the pretrial plea negotiation process").

The record fails to persuade the Court that the allegedly false statements attributed to the United States Attorney or members of his office were material or purposely dishonest. For instance, Lincoln maintains that the United States Attorney's office falsely reported that Lincoln had a teddy bear, box of chocolates, and greeting card on his person at the time of his arrest. (Docket # 43-1 at ¶ 93). The government in the subsequent detention hearing proffer represented that those items were in fact discovered at Lincoln's apartment, where he allegedly intended to take the fictitious victim. (Docket # 14 at 11-12). That variance hardly demonstrates conduct consistent with animus.

Lincoln also maintains that the government purposefully misrepresented in its detention hearing proffer that Lincoln indicated during the interrogation that he had turned into a

15

"creeper or pedophile," when in fact Lincoln had indicated the opposite. (Docket # 43-1 at ¶ 99). Review of the transcript of the detention hearing reveals the existence of a genuine dispute between the parties about the contents of the recorded interview, which was left to the Court to review and resolve. (Docket ## 14 at 12, 14; 15 at 3-5). Prior to rendering a decision on the motion for detention, the Court reviewed the recording, agreed with Lincoln's interpretation, and stated its conclusions on the record. (Docket # 16 at 4-5).

Finally, Lincoln contends that the government also misrepresented in its proffer that other text communications that he had with an eleven-year-old girl evidenced "malicious intent," despite knowing that the communications were "innocuous and entirely accidental." (Docket # 43-1 at ¶ 99). Review of the transcript shows that the government never made any misrepresentations concerning these text messages. To the contrary, the government advised the Court that it did not have any specific information about the content of the communications, other than that they were alarming to the child's parents. (Docket ## 14 at 4, 10, 23; 15 at 7).

The remaining statement attributed to the government involves arguably inflammatory rhetoric (Docket # 43-1 at ¶ 96); in my estimation, the single statement is insufficient to demonstrate actual malice. *Sanders*, 211 F.3d at 718 ("the press release and sentencing letter do not say anything about why the prosecution was brought, much less indicate that 'genuine animus' motivated the decision to prosecute"); *United States v. Feneziani*, 2007 WL 1613630, *2, 7 (W.D.N.Y. 2007) (prosecutor's statements to news publications that despite voluntary dismissal of charges the government would seek to indict defendant, along with inflammatory and false allegations included in criminal complaint, fail to demonstrate "genuine animus"). Accordingly, I recommend that the district court deny Lincoln's motion to dismiss the indictment on the grounds of selective or vindictive prosecution.

II.     **Suppression of Statements**

    A.     **Factual Background**

        1.     **The Recorded Interview**

        This Court has reviewed the video recording of a post-arrest interrogation of Lincoln conducted on February 15, 2018, in a room at the Brighton Police Department.[10] (Docket # 57).  During the interrogation, Lincoln was seated in one of two chairs at a table; Investigator Romach ("Romach"), who conducted the majority of the interrogation, sat in the other chair.  (*Id.* at 9:37:30).  Another law enforcement officer was present, but not generally visible on the videotape.  (*Id.*).  Lincoln was not handcuffed or restrained.  (*Id.*).

        After providing water to Lincoln, Romach told him, "We're here to help you, we'll get through this, everything is going to be ok."  (*Id.* at 9:37:55 – 9:37:59).  He then said:

> Part of this process – we got to read you your rights, like they do on t.v.  You know, you tell me in the conversation that you killed your mom or something happened and – so, I mean, that's not the case, but we have policies and procedures, so we'll get through that – and then we're going to talk.  I'll explain why we ended up where we did, why we are here right now, and then we will go from there, okay?  Sound good?  Take a deep breath man.

(*Id.* at 9:38:00 – 9:38:25).  Romach asked Lincoln if he was hungry, and they discussed Lincoln's daily exercise routine and his educational background.  (*Id.* at 9:38:54 – 9:40:25).  Shortly thereafter, Romach said, "Let's get this over with so we can talk," and read Lincoln his

---

[10]  During proceedings before the Court on October 30, 2019, counsel confirmed that neither party sought an evidentiary hearing on Lincoln's motion to suppress statements.  (Docket # 51).  Rather, the parties agreed that the Court could address the suppression issues based upon its review of Lincoln's recorded interview.  (*Id.*).

*Miranda* rights using a card.[11]  (*Id.* at 9:40:26 – 9:40:48).  He then asked Lincoln, "Do you understand what I've just said to you," and Lincoln responded, "Yes," placed his hand over his heart and laughed nervously.  (*Id.* at 9:40:48 – 9:40:54).  Romach inquired, "With these rights in mind, do you agree to talk to me, to talk to us?"  (*Id.* at 9:40:54 – 9:40:58).  Lincoln responded, "Yeah."  (*Id.* at 9:40:59).  Romach followed up, "Okay, yes?"  (*Id.* at 9:40:59).  Lincoln replied, "Yes."  (*Id.* at 9:41:00).

In response to Romach's initial investigatory question following the *Miranda* advisement, "Why do you think you might be here right now?", Lincoln stated, "I don't know, because I was agreeing to have sex with an underage kid?"  (*Id.* at 9:41:15 – 9:41:20).  Lincoln indicated that he was confused as to how his cell phone number was "selected."  (*Id.* at 9:41:31 – 9:41:42).

Romach responded:

This is where we are at right now.  So, we got a call from a mother who found some text messages on her fourteen-year-old daughter's phone.  Umm, so our main concern here is that you weren't gonna pick this girl up and kidnap her and take her away and tie her up.  You know what I mean?  So that's the most important thing here is that first of all there's nobody's hurt, everybody's safe, and that that wasn't your intentions was to kidnap this girl.  Umm, there was some text messages on this phone and that is kind of how we ended up where we are here today, right now.

(*Id.* at 9:41:42 – 9:42:17).

During the next part of their interaction, Lincoln confirmed his phone number, described how he first came into contact with "Ally," and discussed some of their text

---

[11]  Specifically, Romach stated: "You have the right to remain silent.  You do not have to say anything if you do not want to, that anything can be used against you in a court of law.  You have the right to talk to a lawyer before answering any questions and have him or her here with you.  If you can't pay for a lawyer, one will be given to you before any questioning if you wish.  If you do wish to talk to me, you can stop at any time."  (*Id.* at 9:40:27 – 9:40:48).

communications.  (*Id.* at 9:42:25 – 9:44:15).  Following that exchange, Romach stated, "So you understand the concern here?  Right?  We got to make sure that your intentions weren't to kidnap Ally."  (*Id.* at 9:44:16 – 9:44:21).  Lincoln replied, "No, no."  (*Id.* at 9:44:22).  Lincoln was asked how he ended up at the diner that morning, and he explained that he intended to meet "Ally" and then return to his residence.  (*Id.* at 9:44:44 – 9:45:06).  Following that exchange, Romach questioned Lincoln for approximately three hours.  (*Id.* at 9:45:06 – 13:08:40).  After Romach had finished interrogating Lincoln, Romach left Lincoln alone in the interview room for approximately ten minutes, at which time Romach introduced Lincoln to Deputy Wendy Sears from the Monroe County Sheriff's Office, the law enforcement officer responsible for conducting the polygraph examination which Lincoln agreed to take.  (*Id.* at 12:35:50 – 12:35:52; 13:08:40 – 13:18:26).

### 2.    <u>The Recorded Polygraph Examination</u>

Lincoln submitted the video recording of the polygraph examination in further support of his motion to suppress statements and requested that the Court consider the portion of the recording beginning at 16:40:11 (47:15), near the conclusion of the examination.  (Docket ## 53 at ¶¶ 48-49; 56).  The recording shows that two FBI agents entered the room and introduced themselves.  (Docket # 56 at 16:40:46 – 16:40:52).  One of the agents informed Lincoln that they were there to "take him into custody."  (*Id.* at 16:40:54).  Lincoln responded, "For what?"  (*Id.* at 16:40:56).  The agent replied, "We'll explain all that when we get down there."  (*Id.* at 16:40:57 – 16:41:00).  At that time, Lincoln was directed to stand, and he was handcuffed and escorted from the room.  (*Id.* at 16:41:00 – 16:42:20).

3.     **Lincoln's Affidavit**

Lincoln submitted an affidavit in support of his suppression motions. (Docket # 48-1). According to Lincoln, he believed that he was not free to leave during the interrogation. (*Id.*). Lincoln contends that Romach misled him during the interview, particularly by identifying the purpose of the investigation as a reported kidnapping. (*Id.*). Lincoln maintains he would not have answered any questions if he had not been misled about the purpose of the investigation and provided "other false representations." (*Id.*). According to Lincoln, the false representations led him to believe that he "could help by being honest," and he did not understand that his answers would be used against him. (*Id.*). He further maintains that Romach's representations caused him to believe that he would be released if he assisted in the investigation. (*Id.*).

B.     **Discussion**

Lincoln seeks to suppress the statements he made during the Brighton Police Department interrogation on the grounds that they were obtained in violation of his *Miranda* rights and were not voluntarily made.[12] (Docket ## 43 at ¶¶ 127-33; 48; 48-1; 53 at ¶¶ 48-49). Although Lincoln acknowledges that he was informed of his *Miranda* rights, he argues that his purported waiver and subsequent statements were not voluntary because he was misled about the purpose of the investigation and because the investigators "downplayed" the importance of the *Miranda* warnings.[13] (Docket ## 43 at ¶ 131; 48; 48-1).

---

[12] During oral argument on October 30, 2019, counsel for Lincoln confirmed that Lincoln seeks suppression of statements based only upon the Fifth Amendment and no longer seeks suppression under the Fourth or Sixth Amendments. (Docket # 51).

[13] In his original motion papers, Lincoln also argued that the statements were the fruit of an illegal search and were involuntary because the investigators told him that he could help himself by being honest. (Docket # 43-1 at ¶¶ 131-32). During oral argument on August 14, 2019, Lincoln withdrew his challenge to the search warrant; thus, to the extent he persists in his fruit of the illegal search argument, it should be rejected in view of the withdrawal of his challenge to the warrant. Similarly, although Lincoln's motion generally references statements by the investigators that Lincoln could help himself by being honest, Lincoln has failed to particularize any such

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right. *Miranda v. Arizona*, 384 U.S. at 444. Accordingly, "[e]ven absent the accused's invocation of [his rights], the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011) (alteration in original) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010)), *cert. denied*, 132 S. Ct. 1610 (2012). To establish a valid waiver, the government must prove by a preponderance of the evidence that (1) the waiver was "knowing" – namely, that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," and (2) it was "voluntary" – namely, "that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

In addition to establishing a valid waiver, the government must also establish that the defendant's statements were made voluntarily within the meaning of the Due Process Clause. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000) (acknowledging "two constitutional

---

statements in his submissions or draw the Court's attention to any portion of the video recording evidencing any allegedly improper statements. (Docket # 48). In the absence of any such identification, I recommend denial of the suppression motion on this ground. *See*, *e.g.*, *United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002) ("vague promises of leniency for cooperation . . . generally will not, without more, warrant a finding of coercion"); *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ("[g]enerally, promises of leniency will not render a confession involuntary").

bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth

Amendment right against self-incrimination and the Due Process Clause of the Fourteenth

Amendment").  In examining whether a statement was made voluntarily, a court must consider

the totality of the circumstances in which it was given "to determine whether the government

agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about

[statements] not freely self-determined.'"  *United States v. Kaba*, 999 F.2d 47, 51 (2d Cir.)

(quoting *United States v. Guarno*, 819 F.2d 28, 30 (2d Cir. 1987) (citations omitted)), *cert.*

*denied*, 510 U.S. 1003 (1993).

Depending upon the totality of the circumstances, a confession may be deemed

involuntary if police engage in conduct that is "false, misleading, or intended to trick and cajole

the defendant into confessing."  *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018)

(internal quotations omitted).  In other words, although "coercive police activity is a necessary

predicate to holding a confession constitutionally involuntary," evidence of trickery or deception

on the part of law enforcement is only one factor to consider in evaluating the voluntariness of a

confession.  *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986) and *United States v.*

*Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)); *see also United States v. Peterson*, 2018 WL

6061571, *6 (D. Conn. 2018) ("law enforcement's use of deception is a factor that courts should

consider when determining from the totality of all the circumstances whether a defendant's will

was overborne in a particular case") (internal quotations omitted).  Under circumstances

involving deception, "[a] court must still make specific findings that under the totality of the

circumstances the defendant's will was overborne by the police conduct."  *United States v. Haak*,

884 F.3d at 409 (internal quotation omitted).  Specifically, the court must assess:  "(1) the

characteristics of the accused, (2) the conditions of the interrogation, and (3) the conduct of law

enforcement officials." *Id.* (quoting *Green v. Scully*, 850 F.2d 894, 901-02 (2d Cir.), *cert. denied*, 488 U.S. 945 (1988)). The inquiry is an objective one. *See United States v. Ortiz*, 943 F. Supp. 2d 447, 456 (S.D.N.Y. 2013) (in determining whether a confession is voluntary, "the inquiry into voluntariness is objective . . . [and] based on the totality of the circumstances"); *United States v. McFarland*, 424 F. Supp. 2d 427, 436 (N.D.N.Y. 2006) ("if the police engage in objective behavior constituting impermissible trickery, deceit or coercion, that behavior may undermine a suspect's essential knowledge of his rights and the effect of abandoning [them][;] . . . a defendant's subjective reasons for waiving his *Miranda* rights are irrelevant").

　　　　　On the record before me, I find that Lincoln was properly advised of his *Miranda* rights and voluntarily waived them before speaking to the investigators. The recording demonstrates that Romach recited each of the *Miranda* warnings using a rights form and asked Lincoln whether he understood his rights. Lincoln responded, "Yes." Romach then asked Lincoln if he agreed to talk to the investigators, and Lincoln replied, "Yeah." When Romach sought to confirm Lincoln's affirmative response, Lincoln again responded affirmatively. The fact that Romach told Lincoln that the rights advisement was required by "policies and procedures" and consistent with television depictions did not minimize the significance of the *Miranda* warnings in a manner that rendered Lincoln's waiver unknowing or involuntary. *See Juan H. v. Allen*, 408 F.3d 1262, 1272 (9th Cir. 2005) (finding that officer's statement that *Miranda* was required by the law did not convey that the warnings were unimportant and thus did not impermissibly "downplay[]" their importance; concluding waiver was valid), *cert. denied*, 546 U.S. 1137 (2006); *United States v. Rodriguez*, 2019 WL 112621, *2, 9 (E.D.N.Y. 2019) (finding *Miranda* waiver knowing and voluntary; officers described *Miranda* warnings to defendant as the "same thing as on Law & Order or if you've seen any sort of police show").

I turn next to Lincoln's contention that his statements were the product of impermissible coercion.  In essence, Lincoln maintains that Romach coerced his statements by manufacturing a fictitious emergency involving the reported kidnapping of a minor child and convincing Lincoln that his answers to the investigators' questions could assist in dispelling that emergency.  (Docket ## 43-1 at ¶ 131; 48 at ¶¶ 17-24).

Ample caselaw, particularly in the context of consent to search, supports the proposition that a ruse or deception that creates a false impression of exigency or emergency may render involuntary responses made by a defendant to law enforcement's request for assistance, depending upon the totality of the circumstances.  *Compare*, *e.g.*, *Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 595-96 (1st Cir. 2019) ("courts have uniformly recognized that the Fourth Amendment may be violated when consent is obtained through a law enforcement officer's . . . lies conveying an exigent need for the search"); *United States v. Vazquez-Velazquez*, 2012 WL 917845, *6 (N.D. Ga.) ("[u]nder such circumstances, courts have found that consent is not voluntary because the consentor was led to believe that there was a life-threatening emergency and that his [cooperation] was required to prevent such a calamity"), *report and recommendation adopted by*, 2012 WL 912787 (N.D. Ga. 2012); *United States v. Montes-Reyes*, 547 F. Supp. 2d 281, 288 (S.D.N.Y. 2008) (noting that police fabrication of dire exigencies deprives an individual "of the ability to make a fair assessment of the need to surrender his privacy, and therefore the resulting consent should not be considered valid") (internal quotations omitted) *with United States v. Rivera*, 372 F. App'x 958, 961, 963-64 (11th Cir.) (per curiam) (no plain error in denying suppression motion where defendant made statements after agent told him that fictitious minor whom defendant had intended to meet was missing), *cert. denied*, 562 U.S. 910 (2010); *United States v. Norris*, 2014 WL 2205933, *10 (D. Mass. 2014) (statements

not coerced where agent suggested that the victim was still missing; "even if the agents were not

forthcoming about the victim's whereabouts or the fact that they were aware of her whereabouts,

the Supreme Court has noted that it has 'never read the Constitution to require that the polic[e]

supply a suspect with a flow of information to help him calibrate his self-interest in deciding

whether to speak or stand by his rights'") (quoting *Colorado v. Spring*, 479 U.S. 564, 576-77

(1987)); *United States v. Graham*, 2014 WL 2922388, *12 (N.D. Ga. 2014) ("even if the agents

did trick [defendant] into thinking the investigation was about a missing girl, there is no evidence

they made any promise that questioning would be limited to that subject, or gave him any

assurance that statements relating to other crimes would not be used against him") (quotations

and brackets omitted).  The likelihood that the use of an exigency ruse will render statements

involuntary is greater where the agents pretend to need the defendant's assistance to locate a

missing child or kidnapping victim.  *See United States v. Vazquez-Velazquez*, 2012 WL 917845

at *5 (finding consent involuntary where police gained entry to house through ruse of ongoing

kidnapping investigation; "police exploit[ed] a person's desire to assist the police in preventing

harm to another individual, when the real motivation of the police [was] to find incriminating

evidence against the person who [was] persuaded to assist"); *United States v. Montes-Reyes*, 547

F. Supp. 2d at 291 ("[a] false claim of a missing child is precisely the kind of extreme

misrepresentation of investigatory purpose by which a person" may be deprived of their ability to

fairly assess their rights) (internal quotation omitted).  Indeed, several courts have noted that the

use of false emergencies by police to further investigative goals runs the risk of diminishing

public trust in law enforcement and threatening public safety.  *See Pagan-Gonzalez v. Moreno*,

919 F.3d at 595 ("[b]eyond the coercion inherent in the false emergency scenario, multiple courts

have emphasized the potential public policy hazard created when police officers make false

claims of exigent circumstances[;] . . . [i]n order to ensure cooperation in truly life-threatening

situations, it is vital to maintain the public trust in emergency services") (quoting *Montes-Reyes*,

547 F. Supp. 2d at 288 n.10).

   In this case, Lincoln waived his *Miranda* rights before the officers made any

statements about a kidnapping concern.  Thus, even if the Court were to find that the officers

manufactured a fictitious exigency, such a ruse cannot be said to have coerced Lincoln into

waiving his *Miranda* rights.  *See Colorado v. Connelly*, 479 U.S. at 164 ("[a]bsent police

conduct causally related to the confession, there is simply no basis for concluding that any state

actor has deprived a criminal defendant of due process of law").

   With respect to Lincoln's post-waiver statements, it is well-established that a

Section 2422(b) prosecution may be based upon communications between a defendant and a law

enforcement officer posing as a fictitious minor.  *See United States Gagliardi*, 506 F.3d 140,

146, 147 (2d Cir. 2007) ("the involvement of an actual minor is not a prerequisite to an attempt

conviction under § 2422(b)"; "factual impossibility is not a defense to a charge of attempt in

substantive criminal law") (citation and quotations omitted).  Moreover, the Fifth Amendment is

not contravened by law enforcement's persistence in that pretense during a custodial

interrogation.  *See*, *e.g.*, *United States v. Deal*, 2009 WL 5386061, *14, 15 (M.D. Fla. 2009)

("[d]efendant complains he was misled when police told him he had been communicating with a

real person"; "[t]he ruse did not deprive [d]efendant of the ability to understand his rights or the

consequences of abandoning them, and the ruse was not so egregious as to overbear his will"),

*report and recommendation adopted in relevant part by*, 2010 WL 148458 (M.D. Fla. 2010),

*aff'd*, 438 F. App'x 807 (11th Cir. 2011).

Although Romach told Lincoln that he wanted to ensure that Lincoln had not intended to kidnap Ally, nothing in the record shows that this articulated concern was demonstrably false. Questions regarding what Lincoln intended to do with "Ally" after meeting her were relevant to the investigation. *See United States v. Shehadeh*, 940 F. Supp. 2d 66, 75 (E.D.N.Y. 2012) (agent's conduct did not cross the "line separating tolerable deception from unconstitutional coercion" where agent's "commentary was neither false nor misleading"), *aff'd*, 586 F. App'x 47 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 1185 (2015).

During the interrogation, Romach told Lincoln that he had received a report from the mother of a minor child concerning text messages found on the minor's phone, he was interested in determining whether Lincoln intended to "kidnap" or "tie up" the minor, and his main concern was that no one was hurt and that everyone was safe. Lincoln maintains that these statements led him to believe that the minor's whereabouts were unknown. Nothing Romach said in the identified portions of the interrogation, however, indicated that "Ally" was missing or in danger. Rather, Romach's statements reasonably led to the opposite conclusion – that no one was currently in danger. In fact, the government has represented that the questioning focused on the communications between Lincoln and "Ally" (Docket # 49 at 6), and Lincoln has not pointed to any questions during the several-hour interrogation related to "Ally's" whereabouts or Lincoln's knowledge of her location. In sum, "neither the words spoken by [Romach] nor the context in which he spoke them communicated a clear and unmistakable" message that an emergency existed or that Lincoln's assistance could help resolve it or dissipate any exigency. *See Haak*, 884 F.3d at 413.

Moreover, it is well-settled that law enforcement officers are not required to disclose the crime under investigation prior to or during an interrogation. *See Colorado v.*

*Spring*, 479 U.S. at 577 ("the additional information could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature[;] [a]ccordingly, the failure of law enforcement officials to inform [the defendant] of the subject matter of the interrogation could not affect [the defendant's] decision to waive his Fifth Amendment privilege in a constitutionally significant manner[;] . . . a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intentionally waived his Fifth Amendment privilege"); *United States v. Okwumabua*, 828 F.2d 950, 953 (2d Cir. 1987) ("[s]imple failure to inform defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless the defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead") (internal quotation omitted), *cert. denied*, 484 U.S. 1063 (1988); *United States v. Maney*, 2006 WL 3780813, *10 (W.D.N.Y. 2006) ("[defendant] points to no evidence that either agent affirmatively misrepresented the purposes of the interview when [defendant] was invited to attend or upon [defendant's] arrival at the outset of the interview itself[;] [a]dditionally, no caselaw supports the notion that a failure to reveal fully to the accused the interrogator's specific investigative objectives vitiates an otherwise valid waiver of *Miranda* rights or the voluntary nature of any subsequent questioning").  In this case, Lincoln does not point any questions he posed to Romach about the purpose or scope of the investigation, let alone to any allegedly false answers by Romach to such questions.

At most, Romach's may have sought to minimize the severity of Lincoln's circumstances.[14]  For instance, Romach stated to Lincoln that he was there "to help [him]" and

---

[14] Conceivably, Romach's statements concerning a "kidnapping" could be viewed as an attempt to convince Lincoln that he was investigating a more serious crime (kidnapping) than the crime he was (enticement). Even if Lincoln's submissions could be interpreted to raise this argument – which I do not believe they do – it is far

that "everything [was] going to be ok."  Those statements, judged under relevant caselaw, are not

sufficiently coercive as to render Lincoln's subsequent waiver or statements involuntary.  *See*

*United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992) (defendants' statements voluntary

even though agents deemphasized criminal nature of inquiry); *United States v. Hughes*, 640 F.3d

428, 439 (1st Cir. 2011) (defendant's statements voluntary despite defendant's claim that

troopers improperly led him to believe that he would not be arrested; "the key question is

whether the troopers' actions, viewed objectively, coerced the defendant into speaking[;]

[c]areful perscrutation of the record fails to disclose any extrinsic factors introduced by the

troopers that could have distorted the defendant's judgment about whether to speak freely to

them"); *United States v. Hutchinson*, 2013 WL 3938541, *12-13 (N.D. Ga. 2013) (officers'

statements designed to minimize seriousness of interview, including statements that they did not

think "it was that big of a deal" and that "it was not their purpose to lock him up" did not render

statements involuntary; "[t]o the extent the officers' attempts to downplay the significance of

[defendant's] statements amounted to trickery or deception, it is clear that the police's use of a

trick alone will not render a confession involuntary") (internal quotation omitted); *United States*

*v. Perry*, 2012 WL 447311, *2 (E.D. Mo. 2012) ("even if [the agent] had falsely stated to

[d]efendant that the targets of their investigation were other individuals, and that [d]efendant was

not the target, on these facts, [d]efendant's will was not overborne and any such representations

would not be sufficient to require a suppression of [d]efendant's statements), *aff'd*, 714 F.3d 570

(8th Cir. 2013); *United States v. Gatherum*, 2007 WL 4788472, *9, 13 (S.D. W. Va. 2007)

---

from clear that such statements would amount to an affirmative misrepresentation that "materially induced"
Lincoln's statements.  *See United States v. Patterson*, 2002 WL 31890950, *6 (S.D.N.Y. 2002) (rejecting
defendant's argument that his statements were coerced because he was misled by investigators to believe that they
were investigating a homicide when in fact they were investigating a marijuana conspiracy).

(defendant's statements voluntary despite officer's statement that defendant was not under arrest and free to leave even though officer had five arrest warrants at time of interview that he executed at conclusion of interview), *report and recommendation adopted by*, 2008 WL 200312 (S.D. W.Va. 2008), *aff'd*, 338 F. App'x 271 (4th Cir.), *cert. denied*, 558 U.S. 1083 (2009).  That Lincoln may have been surprised or confused when he was arrested during the polygraph examination does not alter my conclusion.

Considering the totality of the circumstances, I conclude that Lincoln voluntarily waived his rights and spoke with the investigators.  Nothing in the record suggests that Lincoln's age or characteristics rendered him particularly vulnerable to coercion or that he was intoxicated, sick, or in pain.  In fact, Lincoln's general demeanor and conduct during the interrogation do not suggest that he was under any apparent emotional distress beyond the anxiety and concern typical for an individual in his circumstances.  Lincoln was interrogated for approximately three hours; he was not handcuffed; he was provided food and drink; and, Lincoln does not claim that the officers raised their voices or threatened him.  The totality of the evidence relating to Lincoln's characteristics and the conditions of the interrogation do not demonstrate that Romach's conduct had the effect of overbearing Lincoln's will within the meaning of the Due Process Clause.

In sum, I find that Lincoln's waiver was knowing and voluntary and that his subsequent statements were voluntary and free from undue coercion.  Accordingly, I recommend that the district court deny Lincoln's motion to suppress statements.

<u>**DECISION AND ORDER**</u>

<u>**Grand Jury Materials**</u>

The final reserved motion is Lincoln's application for disclosure of the grand jury minutes.  (Docket # 43-1 at ¶¶ 102-05).  There is a presumption that grand jury proceedings are lawful and regular, *United States v. Torres*, 901 F.2d 205, 232 (2d Cir.) (quoting *Hamling v. United States*, 418 U.S. 87, 139 n.23 (1974)), *cert. denied*, 498 U.S. 906 (1990), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010), and disclosure of grand jury proceedings is available only by order of the Court.  Fed. R. Crim. P. 6(e).  A party seeking disclosure bears the burden of establishing a "particularized need" or "compelling necessity" for such disclosure that outweighs the policy of grand jury secrecy.  *Douglas Oil Co. of Cal. v. Petrol Stops Northwest*, 441 U.S. 211 (1979); *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959); *In re Rosahn*, 671 F.2d 690, 695 (2d Cir. 1982).  Unspecified allegations of impropriety or mere speculation are not sufficient to satisfy this heavy burden.  *United States v. Calandra*, 414 U.S. 338, 345 (1974).  Therefore, "review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct."  *United States v. Torres*, 901 F.2d at 233.

In this case, Lincoln maintains that disclosure of the grand jury transcripts might enable him to "supplement" his motion to dismiss, for example, with reference to the instructions provided to the grand jury as to the meaning of the term "criminal offense" in Section 2422(b).  (*Id.*).  As discussed *supra*, I find that dismissal of the indictment is not warranted, and mere speculation that the grand jury was improperly instructed is insufficient to overcome the rule of secrecy in grand jury proceedings that is embodied in Fed. R. Crim. P. 6(e).  *See, e.g.*, *United States v. Donald*, 2009 WL 270181, *6 (W.D.N.Y.) (speculation about inadequacy of jury

instructions insufficient to invade grand jury secrecy), *report and recommendation adopted by*, 2009 WL 960209 (W.D.N.Y. 2009), *aff'd*, 417 F. App'x 41 (2d Cir. 2011); *United States v. Jailall*, 2000 WL 1368055, *2 (S.D.N.Y. 2000) (rule of secrecy, which can only be overcome by a showing by the defendant that grounds exist to dismiss the indictment based upon matters that occurred in the grand jury, applies to legal instructions provided to the grand jury).  I find that Lincoln has not satisfied his burden of establishing a particularized need or compelling necessity for the requested disclosures.  *See Pittsburgh Plate Glass Co. v. United States*, 360 U.S. at 400. Accordingly, Lincoln's request for disclosure of the grand jury minutes is denied.

## CONCLUSION

For the reasons stated above, Lincoln's motion for disclosure of grand jury transcripts **(Docket # 43)** is **DENIED**.  Further, for the reasons stated above, I recommend that the district court deny Lincoln's motions to dismiss the indictment on the grounds of insufficiency, vagueness, and selective or vindictive prosecution.  **(Docket # 43)**.  In addition, for the reasons stated above, I recommend that the district court deny Lincoln's motion to suppress the statements that he made on February 15, 2018.  **(Docket # 43)**.

**IT IS SO ORDERED.**


_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge


Dated: Rochester, New York
      December 23, 2019

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.15

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
December 23, 2019

---

15 Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).