UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

DECISION and ORDER

vs.

19-CR-6047-CJS
24-CV-6104- CJS

MATTHEW D. LINCOLN,
Defendant.

INTRODUCTION

Defendant Matthew Lincoln ("Lincoln" or "Defendant") was convicted upon his plea of guilty, pursuant to a written plea agreement, of attempted receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2). The Court imposed a guideline sentence of 78 months' imprisonment to be followed by 15 years' supervised release. Defendant completed the prison sentence and remains on supervised release. Now before the Court is a motion by Defendant (ECF No. 126) to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. The application is denied.

BACKGROUND

The reader is presumed to be familiar with the history of this action as briefly set forth below.

> On December 26, 2017, the Brighton Police Department ("BPD") received a complaint from the father of an 11-year-old girl who [had] received text messages from the phone number 585-750-7123 (which was later determined to belong to [Defendant]). [Prior to contacting BPD, the girl's father, purportedly seeking to identify the man with whom his daughter had been communicating, had taken the girl's phone, and, pretending to be a 16-yr-old girl name "Jessica," sent text messages to 585-750-7123. Defendant responded to the messages, initially indicating that it appeared

to be a "wrong number" situation. However, Defendant thereafter continued communicating with "Jessica" and asked her for her to send him a picture, even after "Jessica" reiterated that she was 16.][1]

***

Upon receiving this complaint, BPD opened an investigation. [BPD contacted the FBI Child Exploitation Task Force , which determined that, based on the information that had been provided to it, there was no reason to open a file. At which point, an investigator from the BPD and a deputy from the Monroe County Sheriff decide to continue with an investigation.][2]

On February 1, 2018, a BPD undercover officer sent a text message to 585-750-7123[, posing as a 16 year old girl named "Ally."]

***

[Defendant] engaged in sexually explicit conversations with Ally, asked her for pictures of herself, and sent her photos of himself (including of his penis). [Defendant] ultimately arranged to meet Ally in person on February 15, 2018, at Jay's Diner in Brighton, New York. The two planned to go to [Defendant's] apartment after the meeting and have sex. [In texts] [Defendant] explicitly described [to Ally several types of sexual activity that he intended to engage in with her ] when they met[.]

On the morning of February 15th, [Defendant] entered Jay's Diner and was taken into custody by BPD and transported back to their headquarters. [Defendant] was advised of his *Miranda* rights and waived them. BPD then asked [Defendant] why he thought he was in custody, and he acknowledged "...sex with an underage kid." [Defendant] also admitted that: he was the person chatting with Ally; he believed Ally was 16 years old; he thought Ally was in high school; he traveled to the meeting location in Brighton with the intent to meet Ally; he intended to take Ally back to his apartment with him to engage in sex with her; he sent photos of himself clothed and naked to Ally ([Defendant] also identified himself in those photos); he asked Ally for photos of herself and, after he received photos, he masturbated to them;

---

[1] *See*, Sentencing Transcript at p. 9 ("[Defendant's Counsel]: And the father messages from the same phone number saying this is Jessica, and identifying himself as Jessica. And then he starts to say—Matt starts asking for a picture."); *see also, id.* at 10 ("[T]he father says something to the effect of: I'm only 16, do you still want a picture. Matt says: Yes."); 11 (Defendant continued asking for a picture of Jessica after learning that she was 16).

[2] See, Sentencing Transcript at pp. 10-11 ("[Defendant's Counsel:] The FBI Child Exploitation Task Force determined that, based on the information that ha[d] been provided so far, there was no reason to open a file. And then at that point, the investigator from the Brighton Police Department and a deputy from the Monroe County Sheriff decide to pursue this further on their own, and they make the decision to pursue it as a 16-year-old girl named "Ally" and they sent a text message to Mr. Lincoln at that point.").

and he bought gifts for Ally (specifically a heart shaped candy box, a stuffed dog, and a card) and staged those gifts in his residence to give to her following their meeting.

That same day, BPD executed a search warrant at [Defendant's] apartment and found the stuffed dog, chocolates, and card (with Ally's name on it) arranged on a coffee table in the living room. A receipt in [Defendant's] bedroom confirmed the items were purchased the previous day (February 14th). BPD also found an open box of condoms in a Tupperware drawer located in [Defendant's] closet.

***

On March 28, 2019, a federal grand jury returned a one-count indictment against [Defendant], charging him with violating 18 U.S.C. § 2422(b) (Enticement of an Individual under the Age of Eighteen). Count 1 of the Indictment alleges that:

> Beginning on or about February 1, 2018, and continuing until on or about February 15, 2018, in the Western District of New York, and elsewhere, the defendant, MATTHEW D. LINCOLN, using any facility and means of interstate and foreign commerce, that is, a cellular telephone and the internet, did knowingly attempt to persuade, induce, entice, and coerce an individual who had not attained the age of 18 years to engage in sexual activity for which any person could be charged with a criminal offense.

(Dkt. 33.) [If convicted of this crime, Defendant faced a mandatory minimum term of imprisonment of ten (10) years.]

[Defendant], through his counsel, filed a number of pretrial motions. (*See generally* Def. Motions, Dkt. 43-1.) These included a motion to dismiss the Indictment based on selective and vindictive prosecution. (*Id.*, ¶¶ 75-101.) [Defendant's] motions were all denied in a Report and Recommendation, dated December 23, 2019 (Dkt. 58), which was adopted by a Decision and Order of this Court, dated June 18, 2020 (Dkt. 79).

On August 14, 2020, [Defendant] waived indictment and pled guilty to a one-count information charging him with attempted receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2). (Information, Dkt. 89, and Plea Agreement, Dkt. 90.) The Plea Agreement acknowledged that [Defendant] faced a mandatory minimum term of imprisonment of 5 years (*Id.*, ¶ 1) [and]

calculated a guideline sentence of 70 to 87 months. (*Id.*, ¶ 14.) And the government and [Defendant] agreed not to argue for a sentence outside of the guideline range. (*Id.*, ¶ 15.) [However, nothing in the Plea Agreement prevented the Court from imposing a sentence of up to 20 years in prison.][3]

In the Plea Agreement and during the plea colloquy, [Defendant] was advised that he was giving up his right to appeal or collaterally attack his sentence. (Plea Agreement, Dkt. 90, ¶¶ 21-22.) [Defendant] also confirmed that the Plea Agreement "represent[ed] the total agreement between the [Defendant], MATTHEW LINCOLN, and the government," that "[t]here [were] no promises made by anyone other than those contained in [the Plea Agreement]," and that the Plea Agreement "supersede[d] any other prior agreements, written or oral, entered into between the government and the [petitioner]." (*Id.*, ¶ 29.) [Defendant] further acknowledged that the Plea Agreement "represent[ed] the total agreement reached between [himself] and the government," and that "[n]o promises or representations [were] made to [him] other than what [was] contained in [the Plea A]greement." (*Id.*, p. 12.)

A Presentence Investigation Report was filed on July 30, 2021 (Dkt. 102), and revised on November 8, 2021 (Dkt. 104) and February 10, 2023 (Dkt. 117). The Revised PSR summarized the government's proof against the defendant. The Revised PSR also contained a section titled "Communications with Other Minors," which stated, in part:

> 42. During the analysis of the defendant's cellular phone, additional messages with other minors were discovered. On July 30, 2020, the Case Agent (CA), a Task Force Officer with the Federal Bureau of Investigation (FBI) and a Special Agent (SA) with the FBI, interviewed the minors who were involved in those text message conversations.
>
> 43. The three minors, C.S. (CW3), A.S. (CW4), and B.C. (CW5), were all born in 1998. They indicated they first met LINCOLN when they were approximately 13 or 14 years old. They believed they started communicating with him through the online chat application "Omegle". CW3 and CW5 stated following their online conversation with LINCOLN, they agreed to meet him in person. LINCOLN picked them up and drove them to Wegmans while CW4 stayed at

---

[3] *See*, Plea Agreement at ¶ ¶ 1, 14.

CW5's residence. All three indicated they communicated to LINCOLN via Kik Messenger, text messages, and Facebook messenger. They stated they never lied about their age during the conversations and LINCOLN was aware how old they were. CW4 indicated she found messages between herself and LINCOLN wherein LINCOLN made comments about her being in school and when she might be graduating in addition to comments where LINCOLN had wished her a happy birthday and asked if she was turning 17 or 18. The CA located the following text communication between CW4 and LINCOLN:

a) LINCOLN: "Oh my god. I totally meant to text you earlier today. It has been a super crazy week for me. Sorry for sending this so late but Happy Birthday! I hope you had a great day and hopefully we can hang out some time soon and I can buy you some drinks or something like that for your Birthday gift or that."

CW4: "Aw thank you don't worry about it and yah I haven't seen you in forever"

LINCOLN: "Your welcome and I know. You are 17 or 18 now?"

CW4: "17"

LINCOLN: "Cool."

44. CW3 further stated LINCOLN was always trying to get her to "kiss" him and do "stuff" with him. When asked what stuff CW3 was referring to, CW3 stated, "sexual stuff". When asked how they mostly communicated with LINCOLN all three stated primarily through text message. They indicated when they asked for something from LINCOLN such as money, alcohol, or cigarettes, LINCOLN would ask to do stuff in return. When asked to clarify this, all three stated that at one point LINCOLN had asked each of them individually to send him nude pictures or ask for a "bj". When LINCOLN realized the "bj" was not going to occur, CW3, CW4, and CW5 stated LINCOLN would then request a kiss. None of them believed they had sent any nudes to LINCOLN. CW3 and CW5 indicated they had never done anything sexual with LINCOLN.

CW4 stated she had not done anything sexual with LINCOLN but did kiss LINCOLN at his request. CW4 stated when she was 15 years old she requested money from LINCOLN and he agreed to give it to her. CW4 met LINCOLN in a parking lot on St. Paul Street and he gave her some money. CW4 recalled following this, LINCOLN stated something like, I'm not going to get anything? CW4 said LINCOLN requested oral sex for the money and she said no, so LINCOLN then requested a kiss. CW4 said she agreed to kiss LINCOLN for a few seconds. The CA found the following text communication from 2016 which corroborates CW4's story:

a) LINCOLN: "Did that kiss a couple years ago mean anything to you or not?"

CW4: "I did it because you asked for it"

CW4: "I am gay"

LINCOLN: "Oh. So you were gay at that time too?"

CW4: "Pretty gay"

LINCOLN: "Ah. So that's why you never followed through with the bj?"

CW4: "Excuse me"

LINCOLN: "Sorry"

LINCOLN: "At test time you were saying you would. Just trying to understand it all"

CW4 and CW5 stated LINCOLN had sent them nudes of himself. CW4 described it as a "full body" picture LINCOLN took of himself standing in front of the mirror. CW3 did not recall if LINCOLN ever sent her nude pictures. CW3 indicated CW4 had shown CW3 the pictures after LINCOLN sent them to CW4. Additionally, CW4 stated she told LINCOLN her cell phone was broken so LINCOLN proceeded to purchase her a cell phone.

(Revised PSR, Dkt. 117, ¶¶ 42-44.)

Neither party filed any objections to the Revised PSR. On February 10, 2023, [Defendant's] counsel filed a sentencing statement. (Dkt. 116.) In that statement, [Defendant's] counsel [repeated] some of the legal arguments that he had unsuccessfully litigated in pretrial motions. However, he went on to acknowledge that:

> [Defendant] recognized that engaging in the communication was wrong. He is deeply embarrassed by the decisions he made resulting in the charges in this case. He made a decision to accept responsibility, and enter into a plea agreement. In doing so, he waived his right to a trial, and he agreed to waive his right to appeal, including the issues that had been briefed during motion practice.

(*Id.*, p. 9.)

On February 17, 2023, this Court imposed a guideline sentence of 78 months' imprisonment to be followed by 15 years' supervised release. [In that regard, when calculating Defendant's sentencing range under the advisory Sentencing Guidelines, the Court reduced Defendant's offense level by three points for acceptance of responsibility.][4] [Defendant] never appealed any portion of his sentence or underlying conviction. He has since completed his term of imprisonment and is currently on supervised release.

On February 14, 2024, [Defendant] filed [the subject] *pro se* motion to vacate his sentence pursuant to 28 U.S.C. § 2255. (Dkt. 126.) In it, [Defendant] argues that his sentence should be vacated because: (1) [ ] he was selectively prosecuted in violation of the Equal Protection and Due Process clauses of the Fourteenth Amendment; (2) [the prosecuting] Assistant United States Attorneys ("AUSAs") Gestring and McGuire committed prosecutorial misconduct and *Brady* violations; and (3) [his] defense [attorneys] were ineffective in their representation of him. (*Id.*)

Government's Response, ECF No. 132 at pp. 1-10.

---

[4] Sentencing Transcript, ECF No. 124 at pp. 39-41. Because the Court granted Defendant acceptance of responsibility, his offense level was reduced from 30 to 27, which, with a Criminal History Category I, resulted in a guideline range of 70-87 months. Without acceptance of responsibility, with an offense level of 30 the range would have been 97-121 months.

Regarding the alleged equal protection violation, Defendant contends that after initially concluding that he had not committed any crime of which they were aware, BPD continued investigating him, in part because he was a children's swim coach who "had access to children." Defendant maintains that he was therefore "arbitrarily" investigated because of his occupation, which he contends is a "protected classification." ECF No. 126 at pp. 2-4 ("[T]he arbitrary classification would be occupation."); *see also, id.* at p. 10 (Asserting that it is an equal protection violation for the Government to investigate "person[s] in a position of trust with regular access to children," since that "is clear selective prosecution of certain types of individuals.").

Related to this claim, Defendant further contends that BPD's undercover investigation was unlawful since officers failed to follow various investigative protocols "under both Internet Crime Against Children (ICAC) Standards and [Brighton Police Department] General Rules." Plaintiff maintains, for example, that these protocols required police to cease any investigation of him after their initial investigation found no wrongdoing.[5]

The gist of Defendant's arguments on these points is that BPD should not have been investigating him at the time his communications with "Ally" occurred, and that therefore his conviction should be set aside.

Regarding the allegation of prosecutorial misconduct/*Brady* violation, Defendant asserts that the prosecuting AUSAs "repeatedly misrepresented the facts of the case in

[5] Defendant asserts that undercover investigators also improperly posed as "a 16 ½-year-old girl" rather than someone younger. ECF No. 126 at pp. 4-6. Further, Defendant essentially alleges that investigators entrapped him by sending him text messages communications with "a very high use of emojis to shape [his] mindset," and by portraying the fictional underage female "Ally" as being interested in sex. ECF No. 126 at pp. 6, 9.

court"[6] and breached the Plea Agreement by informing Probation of other misconduct by him with underage girls, discussed above, that did not relate to the specific charge to which he pled guilty.[7] Defendant also maintains that prosecutors "lie[d] [to his attorney] about their inability to do a physical extraction of [his] phone" by claim[ing] to only be able to do a logical extraction," which, he contends, "hid[ ] the fact" that [a police investigator] tampered with his phone by "removing exculpatory material." ECF No. 126 at p. 11. In particular, Defendant contends that the alleged missing exculpatory information would have shown that, in connection with the events in 2017 that brought him to the attention of BPD, he at first believed he was texting with a "27 year old" registered nurse named Jessica, rather than with an 11 year old girl.[8] He further posits that if such information showed that he initially was not "looking for someone underage," then police would not have had any reason to continue investigating him, and the crime he committed in 2018 involving "Ally" would not have occurred, since undercover officers would not have been communicating with him.[9]

Regarding the alleged ineffective assistance of counsel, Defendant contends that his first defense attorney, Assistant Federal Public Defender Mark Hosken ("Hosken"), gave him insufficient advance notice that he would be retiring from the Public Defender's

[6] Defendant asserts, for example, that prosecutors incorrectly asserted to the Court that he had "initiated certain sexual and grooming topics" in his texts with undercover officers, and that they misstated "how [his] name came to the attention of BPD." ECF No. 126 at p. 10.

[7] *See, e.g.*, ECF No. 126 at pp. 10-11 ("The agreement was if I took the plea that I did at that point, they would not focus on that and provide much information if any on it to probation as it was not part of what I pled guilty to."). He also vaguely asserts that there were "inaccurate facts" in the PSR. *Id.* at 11.

[8] *See*, ECF No. 132 at p. 17 ("He claims a full physical extraction would have shown that his phone was tampered with and that messages between himself and the father who filed the initial complaint with BPD were deleted.").

[9] ECF No. 126 at p. 14. As the Government correctly notes about this line of reasoning by Defendant, his "argument is not that he did not commit the crime of which he was convicted. Rather, the crux of [his] argument is that he never should have been the target of an undercover investigation in the first place." ECF No. 132 at p. 22..

office, and tried to "push" Defendant into a plea deal by "playing [Defendant] as an idiot." ECF No. 126 at p. 15. Defendant asserts that another defense attorney, Assistant Federal Public Defender Anne Burger ("Burger"), "twisted everything around" by misstating to the Court that he wanted new counsel after he sent Burger a letter criticizing how she and other members of the Federal Public Defender's office had been representing him. *Id.* at p. 16.[10] Defendant alleges that his third and final attorney, Mark Foti ("Foti"), "had a quick change of demeanor" after the indictment was unsealed, "tr[ied] to get out of the case," and failed to present facts to the Court that Defendant wanted him to present. ECF No. 126 at p. 16.

Defendant further alleges that Foti "pressured" him into accepting the plea, rather than properly investigating the case, and, indeed, that all three attorneys failed to perform a proper investigation: "When it came to the plea I did take it, it was nothing but pressure from him [(Foti)] to just take it instead of doing something that he nor the other two [attorneys] did—that's do an investigation on my behalf." *Id.* More specifically, Defendant contends that the attorneys should have subpoenaed his phone records from Verizon, examined police reports to see if they were accurate, and provided him with an extraction of his cell phone. Defendant asserts that these alleged failures by counsel were harmful, since they prevented him from demonstrating that his phone's text records had been tampered with, concerning his texts to the phone of the eleven year old girl, as discussed earlier.

Additionally, Defendant contends that attorney Foti should have requested a

---

[10] For example, Defendant accused Burger, Hosken, and other members of the Federal Public Defender's Office of lying to him and his parents, and of conspiring with the prosecution *See, e.g.*, ECF No. 141-1 at pp. 104-105.

*Franks* hearing, since one of the police investigators on the case had a conflict of interest from being "life-long friends" with people in "the local swimming community" against whom Defendant had filed a complaint in 2017, alleging that they had improperly recruited swimmers from the team he coached. *See*, ECF No. 141-1 at p.53. According to Defendant, this alleged bias by the investigator adds weight to his claim that he was improperly selected by prosecution based on his occupation as a swim coach.[11]

Defendant also moves for recusal, or, as he puts it, a "change on the bench," purportedly since he has "lost confidence" in the undersigned's ability to "look at and weigh evenly what's in [his] best interest." ECF No. 126 at p. 18. As evidence of the Court's alleged bias or unfitness, Defendant states that the undersigned did the following: Made rulings adverse to him; sometimes "seemed to not remember anything from prior portions of the case"; "ignored stare decisis"; postponed a court appearance due to a medical appointment; urged Defendant to work with his attorneys; "disregarded" character letters submitted on his behalf; and "released" an inmate who had assaulted Defendant in the Yates County Jail. *Id.*

The Government opposes Defendant's motion for reasons including the following: 1) the motion is barred by the Plea Agreement's collateral-attack waiver, since the Court imposed a sentence within the range set forth in the Plea Agreement; 2) the claims in the motion are procedurally defaulted and barred insofar as they were not raised on direct appeal and Defendant has now shown either actual innocence or cause and prejudice relating to such failure; and 3) the motion's claims lack merit in any event.

---

[11] *See*, ECF No. 126 at p. 17 (This would have exposed his conflict of interest in this case – providing further motive to unconstitutionally reach out to me with no criminal act or history."). Defendant further alleges that Foti should have attempted to have Defendant's statement to police on the day of his arrest suppressed, based on missing body camera footage. *Id.*

Defendant filed a reply, ECF No. 141, which, at 27 pages, is actually lengthier than his original motion and far exceeds the page limits (10 pages) for replies established by Rule 7(c) the Local Rules of Civil Procedure and Rule 12(c) of the Local Rules of Criminal Procedure. Most of what is contained therein is cumulative of facts and arguments already before the Court, with much of the submission reiterating that it violated Equal Protection or Due Process for BPD to investigate Defendant because he was a children's swim coach, purportedly since there is no reason to think that a coach or other adult working with children would be more likely to commit a sex crime against a child than anyone else.

The reply also reiterates that alleged phone tampering by the Government improperly led to his investigation and conviction, purportedly since the complete contents of his phone would show that when he initially began communicating with the 11-year old girl in Brighton, he thought he was talking with a 27 year old named Jessica. *See*, Reply, ECF No. 141 at p. 21 ("[I]f I'm able to prove that I was predisposed to "Jessica" being an adult, it would provide no basis for them to go undercover on me."). Defendant insists that since he was "predisposed" to think that "Jessica" was an adult, his communications with her should not have resulted in any further investigation of him.[12]

The reply also now asserts Defendant did not understand that the appeal/collateral attack waiver in the Plea Agreement barred him from filing a collateral attack (even though that is what it clearly states, and that is what the Court explained to him).[13] Defendant

[12] ECF No. 141 at p. 21. Of course, Defendant admits, as he must, that he asked "Jessica" to send him a picture even after she informed him she was sixteen, but contends that he only did so "to find out who they were as [he] knew someone was messing with [him]."
[13] ECF No. 141 at pp. 8, 9; *see also*, Plea Agreement at pp. 8-9 ("The defendant, however, knowingly waives the right to appeal and collaterally attack any component of a sentence imposed by the Court which falls within or is less than the sentencing range for imprisonment . . . set forth in Section III, ¶ 14, above[.]").

argues, in any event, that such waiver does not prevent him from now raising constitutional claims, including claims for Equal Protection violations and ineffective assistance of counsel.

Defendant also now claims that his admissions to the police should have been suppressed as involuntary, and disputes the accuracy of statements in the PSR to which he never objected at or prior to sentencing, such as those concerning his relevant conduct with the three aforementioned underage girls besides "Ally."[14]

Further, Defendant's reply contends that he is actually innocent of any wrongdoing, and spends several pages speculating that there may have been a conspiracy to target him for investigation involving BPD officers, prosecutors, and community members who knew him through his coaching activities, to retaliate against him for filing a swimming competition complaint in 2016.[15]

Finally, Defendant rather comically adds, as a reason that the Court should recuse itself, the purported fact that the undersigned "used to play sports" against Defendant's cousin, who, since he was an "excellent athlete," "won a lot against" the undersigned, which "could easily create a conflict with animosity."[16]

The Court has carefully considered the parties' submissions and the entire record, and, for the reasons discussed below, denies Defendant's motion.

---

[14] Although, in the appendix to his reply, Defendant admits to his attorney that interactions with "the 3 [underage] Webster girls" discussed in the PSR occurred and that he was "not proud of it." ECF No. 141-1 at pp. 121, 124

[15] *See, e.g.*, ECF No. 141 at p. 14 ("As for the prosecution, there may have been a potential association between Gestring and Regelsberger as they lived in the same neighborhood in Chuchville. Regelsberger's husband, Todd, has a very wealthy-positioned career such as Gestring that they may have known each other.").

[16] ECF No. 141 at p. 26.

ANALYSIS

Defendant's *Pro Se* Status

Since Defendant is proceeding *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

Defendant's Motion for Recusal is Denied

As a preliminary matter, Defendant's motion for recusal is denied. "Title 28 U.S.C. § 455(a) requires a judge to recuse himself 'in any proceeding in which his impartiality might reasonably be questioned.'" *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 150 (2d Cir. 2014) (quoting 28 U.S.C. § 455(a) ). "Recusal motions 'are committed to the sound discretion of the district court[.]'" *Abidekun v. N.Y.C. Transit Auth.*, No. 93-CV-5600 (FB), 1998 WL 296372, at *2 (E.D.N.Y. June 4, 1998) (*quoting United States v. Conte*, 99 F.3d 60, 65 (2d Cir. 1996) ). "In cases where a judge's impartiality might reasonably be questioned, the issue for consideration is not whether the judge is in fact subjectively impartial, but whether the objective facts suggest impartiality." *Williams v. LaClair*, No. 9:10-CV-635 (GLS/RFT), 2013 WL 1193766, at *3 (N.D.N.Y. Jan. 29, 2013) (*citing Liteky v. United States*, 510 U.S. 540, 548, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994) ), report and recommendation adopted, No. 9:10-CV-0635, 2013 WL 1193741 (N.D.N.Y. Mar. 22, 2013).

> A showing of bias or partiality must ordinarily be based on "extrajudicial conduct ... not conduct which arises in a judicial context." *Lewis v. Tuscan Dairy Farms, Inc.*, 25 F.3d 1138, 1141 (2d Cir. 1994) (internal quotation marks and citation omitted). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994).

*United States v. Aguiar*, No. 2:09-CR-90-1, 2025 WL 3746299, at *7 (D. Vt. Dec. 23,

2025).

Here, to the extent Defendant contends that this Court was unprepared or medically unfit to preside over his case, that it ignored binding precedent, or that it "ignored" submissions, such contentions are demonstrably false[17] and would not, in any event, provide grounds for recusal. Further, that the Court may have encouraged Defendant to cooperate with his attorneys is obviously not a basis for recusal. Also, the fact that the Court made rulings adverse to Defendant is not a sufficient basis for granting recusal. Finally, the suggestion that the Court has some personal bias against Defendant, especially one arising from having "played sports" against his cousin decades ago, is absurd at best, especially considering that the Court sentenced Defendant to far less prison time than it could have, and even below the high end of the sentencing range agreed-to in the Plea Agreement. Consequently, the motion for recusal is denied.

<u>Section 2255 Principles</u>

Turning to the substantive principles governing Defendant's motion, Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). "[A] collateral attack on a final judgment in a federal criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in

[17] For example, Defendant argues that the Court commented that it had only reviewed his submissions "just before coming into the courtroom," ECF No. 126 at p. 19, but the Sentencing Transcript clearly indicates that the Court was referring to late submissions from defense counsel, which the Court nevertheless reviewed and considered. *See, e.g.*, Sentencing Transcript at p. 25 ("Mr. Foti: I appreciate the Court accommodating the lateness of any filings that we made.").

the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (citations and internal quotation marks omitted).

An Evidentiary Hearing Is Not Required

The Court may dismiss a section 2255 petition without conducting a hearing if the petition and the record "conclusively show" that the defendant is not entitled to relief. 28 U.S.C. § 2255(b). Notably, a defendant does not become entitled to an evidentiary hearing merely by making assertions that are conclusory or that contradict his prior sworn statements to the Court:

> An evidentiary hearing is not required "when the allegations on a motion ... merely contradict the record, are inherently incredible, or are simply conclusory." *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir.1992); *see also Brown v. United States*, 637 F.Supp.2d 212, 23 (S.D.N.Y.2009 (collecting cases) ("[The movant]'s claims of ineffective assistance of counsel in connection with his guilty plea are conclusory, contradicted by the record, unsupported by evidence and therefore are merit less."); *Chen v. United States*, Nos. 06 Civ. 7159, 02 Cr. 1039, 2007 WL 4358466, at *3 (S.D.N.Y. Dec. 7, 2007) ("'[I]n the absence of any credible evidence to the contrary, the court is permitted to rely upon the defendant's sworn statements, made in open court, that: his plea was knowing and voluntary [and] he had discussed the plea with directly contradict his more recent self-serving allegations, his ineffective assistance claim is dismissed.") (*quoting United States v. Soler*, 289 F.Supp.2d 210, 216 (D.Conn.2003), *aff'd*, 124 Fed. Appx. 62 (2d Cir.2005). If an evidentiary hearing is found to be unnecessary under this standard, the § 2255 motion may be dismissed. In evaluating the need for a hearing, "a district court on habeas review may rely on the defendant's sworn statements and hold him to them." *Padilla v. Keane*, 331 F.Supp.2d 209, 217 (S.D.N.Y 2004); *see also; Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations ... is subject to summary dismissal....").

*Pineda v. United States*, No. 10 CIV. 2385 RJH JCF, 2010 WL 6501656, at *3 (S.D.N.Y.

Oct. 26, 2010), report and recommendation adopted, No. 10 CIV. 02385 RJHJCF, 2011 WL 1419615 (S.D.N.Y. Apr. 11, 2011).

Here, the Court finds that an evidentiary hearing is not required, since there are no genuine issues of fact and the record conclusively shows that Defendant is not entitled to relief. For example, Defendant's assertions that he is actually innocent, that his attorneys pressured him into pleading guilty, and that he did not understand he was waiving his right to bring a collateral attack, are all flatly contradicted by his sworn statements at the Plea Hearing.[18]

Nor has Defendant otherwise demonstrated the need for an evidentiary hearing. For example, Defendant's assertion that prosecutors lied to the Court about his initial text messages to the 11 year old girl's phone are disproven by the record;[19] his claim that prosecutors lied about the Government's ability to extract data from his phone is based only on hearsay;[20] and his contention that police tampered with his phone is unsubstantiated. Furthermore, his arguments about alleged missing texts/phone tampering are irrelevant, since they concern texts that are unrelated to the crime to which he pled guilty,[21] and since his theory that such texts provided an insufficient basis for

[18] For example, at the Plea Hearing the Court specifically explained to Defendant the meaning of the term "collateral attack," and Defendant indicated that he understood that in the Plea Agreement he was waiving the right to right to appeal or collaterally attack any sentence that includes a term of incarceration of 87 months or less.

[19] For example, Defendant's suggestion that AUSA Gestring lied about the circumstances of those texts to gain leverage at the detention hearing is flatly contradicted by the transcript, which shows that Gestring repeatedly disclaimed any reliance on that incident to prove the Government's case or to prove that Defendant should be detained prior to trial.

[20] In particular, Defendant merely asserts that his attorney, Mr. Foti, said that the Government claimed to be unable to perform such an extraction.

[21] In particular, when explaining the purported significance of the alleged missing texts, Defendant states: "[S]ome of that information would have shown my predisposition of that number [(the telephone number of the 11-year-old gird] previously belonging to a 27-year-old female registered nurse. It would also show that there is a text message missing from the father's phone of our text exchange[.]" Section 2255 Motion, ECF No. 126 at p. 11.

police to investigate him lacks merit, as discussed further below.[22]

Defendant's request for an evidentiary hearing is therefore denied.

Defendant's Claims Lack Merit

The Government maintains that the subject Section 2255 motion is barred by the Plea Agreement, since the agreement contains a waiver of Defendant's right to appeal or collaterally attack any sentence imposed by the Court which included a term of imprisonment of 87 months or less, and the Court sentenced him well below that number, to 78 months. The Government alternately contends that Defendant's claims are procedurally defaulted and barred since Defendant did not raise them on direct appeal and has not shown either actual innocence or cause and prejudice relating to such failure. Finally, the Government asserts that Defendant's claims lack merit in any event.

Defendant appears to maintain that his claims are meritorious and neither barred by the collateral-attack waiver or procedurally defaulted.

The Court need not engage in a lengthy discussion concerning the collateral attack waiver or the alleged procedural default, since it agrees with the Government that Defendant's claims lack merit in any event.

*The Equal Protection/Due Process/Selective Prosecution*[23] *Argument Lacks Merit*

---

[22] Again, Defendant asserts that such an extraction was necessary to show that he was "predisposed" to initially think that "Jessica" was an adult. However, Defendant continued texting the number even after Jessica stated that she was sixteen, and, in any event, such text conversation is irrelevant to the later crime involving "Ally" to which he pled guilty.

[23] *See, e.g., McGill v. United States*, No. 1:14-CR-167-WSD-LTW, 2018 WL 4523154, at *7 (N.D. Ga. Mar. 20, 2018) ("A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *United States v. Armstrong*, 517 U.S. 456, 463 (1996). The U.S. Supreme Court's decisions "delineating the necessary elements to prove a claim of selective prosecution have taken great pains to explain that the standard is a demanding one." *Id.* A defendant must show by "clear evidence" that the decision to prosecute was based on a constitutionally protected characteristic, such as race or religion. *Id.* at 464-65 (quotation marks omitted)."), report and recommendation adopted, No. 14-CR-167-AT, 2018 WL 4002055 (N.D. Ga. Aug. 21, 2018).

To begin with, Defendant's primary claim, that BPD violated his federal Equal Protection or Due Process rights by launching its undercover investigation, clearly lacks merit. In that regard, Defendant asserts that it violated Equal Protection, or otherwise amounted to an improper selective prosecution, for police to investigate him because he was a swim coach who had access to children.

However, such argument lacks merit since a person's occupation or employment status is not a protected characteristic for Equal Protection purposes.[24] *See, e.g., Green v. Kelly*, No. 99 CIV. 9082 (DLC), 2000 WL 1871711, at *8 (S.D.N.Y. Dec. 21, 2000) ("Occupation, unlike race or gender, is not a category protected by *Batson* 's Equal Protection Clause analysis: "[W]here peremptory challenges are made on the basis of group characteristics other than race or gender (like occupation, for example ), they do not reinforce the same stereotypes about the group's competence or predispositions." *J.E.B.* [*v. Alabama*], 511 U.S. [127,] 142 n. 14 [(1994)] (emphasis added). As a result, . . . petitioner's argument fails to invoke a federal question and is therefore inappropriate for federal habeas review, which extends only to "violation[s] of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).") (citation omitted); *see also, Passino v. Fulton Cnty. New York*, No. 1:25-CV-00727 (AMN/DJS), 2026 WL 817990, at *12 (N.D.N.Y. Mar. 25, 2026) ("Plaintiff also has not alleged membership in a protected class under Section 1985(3). To the extent that Plaintiff claims that Defendants were motivated by class-based discriminatory animus due to Plaintiff's employment as a dog control officer, dog control officers are not a protected class because they "plainly do not possess the type of inherited or immutable characteristics sufficient to satisfy the class-based

[24] Defendant's 2255 motion baldly asserts that "occupation" "has been a protected classification throughout our society for many decades." ECF No.126 at p. 4. However, that statement is incorrect.

animus requirement.") (citations omitted); *Jackson v. Pitney Bowes, Inc.*, 753 F. App'x 413, 414 (7th Cir. 2019) ("[A]n amendment [to the pleading] would have been futile. Jackson alleges that the defendants discriminated against her because she was a temporary worker[, but] [a]s the district court correctly noted: "Temporary employment is not a protected class . . . under any federal law."); *Alemu v. Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 47 (D.D.C. 2018) ("Plaintiffs do not specify that they belong to a protected class, but rather only that [defendants] "have treated the class of plaintiffs named herein (and other drivers) in an unequal manner." This type of amorphous class based on employment status is not a "protected class, such as one based on race, national origin, or gender," justifying heightened constitutional scrutiny.") (citation omitted). *Mercado Garcia v. Ponce Fed. Bank, F.S.B.*, 779 F. Supp. 620, 629 (D.P.R. 1991) ("Even if we assume that Mercado's status as a former bank employee was the primary motivation for the bank's decision not to grant a further extension, we would not have a discrimination claim, since a person's employment status is not a protected category[.]"), *aff'd sub nom. Mercado-Garcia v. Ponce Fed. Bank*, 979 F.2d 890 (1st Cir. 1992).

Furthermore, it is evident that BPD did not target Defendant for investigation simply because he was a swim coach, but, rather, because he was an adult swim coach who had sent texts to the phone of an eleven year old girl, and then communicated with what he believed was a sixteen year old girl, and asked her for a picture of herself.

Nor, contrary to what Defendant seems to believe, is there any Due Process or other constitutional right to be free from criminal investigation absent some particular evidence of wrongdoing. In this regard, Defendant maintains that his texts with "Jessica" did not provide BPD with a sufficient basis to target him with an undercover investigation.

However, the Court disagrees. *See, e.g.*, *Garrido v. Cnty. of Los Angeles*, No. 2:23-CV-00011-SPG-E, 2025 WL 4058864, at *20 (C.D. Cal. Sept. 10, 2025) ("While the Ninth Circuit does not appear to have addressed this question, other circuit courts have consistently held that there is no due process right to be free from a criminal investigation.") (collecting cases); *Green v. Lumpkin*, No. 6:22-CV-218-JDK-JDL, 2022 WL 2496194, at *1 (E.D. Tex. July 5, 2022) ("[Petitioner] has no constitutional right not to be 'under investigation.'"); *Rehberg v. Paulk*, 611 F.3d 828, 850 (11th Cir. 2010) ("The initiation of a criminal investigation in and of itself does not implicate a federal constitutional right. The Constitution does not require evidence of wrongdoing or reasonable suspicion of wrongdoing by a suspect before the government can begin investigating that suspect. *See United States v. Aibejeris*, 28 F.3d 97, 99 n. 24 (11th Cir.1994)."), *aff'd*, 566 U.S. 356, 132 S. Ct. 1497, 182 L. Ed. 2d 593 (2012); *United States v. Jones*, No. CR413-203, 2015 WL 134330, at *3 (S.D. Ga. Jan. 9, 2015) ("[L]aw enforcement officers are free to investigate their hunches; they just may not indulge their gut instincts or ill-defined suspicions as a basis for a Fourth Amendment seizure.").

And, in any event, the Court believes it was objectively reasonable for BPD to investigate Defendant, again considering it had evidence that Defendant was an adult swim coach who had sent texts to the phone of an eleven year old girl, and then communicated with what he believed was a sixteen year old girl, and asked her for a picture of herself.

The Court also finds no merit to Defendant's argument that his conviction should be set aside since BPD investigators allegedly violated certain investigative protocols and procedures. *See, e.g., McGill v. United States*, No. 14-CR-167-AT, 2018 WL 4002055, at *2 (N.D. Ga. Aug. 21, 2018) ("The ICAC Standards may well provide guidelines for how

law enforcement agencies perform investigations and sting operations of the sort used to arrest Movant. However, as the Magistrate Judge concluded, the possibility that the agents involved in Movant's arrest failed to follow those guidelines would not, standing alone, indicate that Movant is not guilty or that his constitutional rights had somehow been violated.").

*The Prosecutorial Misconduct/Brady Arguments Lack Merit*

Nor does the Court find any merit to Defendant's argument that his conviction should be set aside due to prosecutorial misconduct, including an alleged *Brady* violation. Firstly, Defendant's assertion that prosecutors lied to the Court about the circumstances leading to the undercover investigation is factually baseless, and his claim that they breached the Plea Agreement by providing information to Probation concerning his interactions with other underage girls besides "Ally" is legally meritless. As for Defendant's claim of a *Brady* violation,

> [t]here are three elements to a *Brady* violation: first, the evidence must be favorable to the defendant "either because it is exculpatory, or because it is impeaching"; second, the "evidence must have been suppressed by the prosecution, either willfully or inadvertently;" and third, "prejudice [to the defense] must have ensued." *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) (alteration omitted) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)), *cert. denied*, 555 U.S. 1033 (2008). . . . Suppressed exculpatory evidence is prejudicial, if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006) (citation and quotation marks omitted). When seeking vacatur based on a *Brady* claim, a defendant is required to show that "the favorable evidence [including evidence related to witness credibility] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* (citations and quotation marks omitted)[.]

*Halloran v. United States*, No. 13-CR-297 (KMK), 2020 WL 589410, at *13 (S.D.N.Y. Feb. 6, 2020). Here, even assuming that Defendant could establish the first two elements, which the Court does not believe he has done, he clearly has not shown that the allegedly suppressed evidence was prejudicial. In this regard, Defendant asserts that prosecutors suppressed phone records that would establish that when he first began texting the phone belonging to the eleven year old girl in Brighton, he was "predisposed" to think that the number belonged to an adult woman, and, consequently, there should not have been any further investigation of him. However, the Court disagrees and finds that even assuming such records would show that Defendant *initially* thought he was texting an adult during that interaction, such evidence would do nothing to undermine confidence in Defendant's conviction for his subsequent, unrelated conduct involving his attempt to obtain child pornography from a different girl he believed to be sixteen years of age.

*The Ineffective Assistance of Counsel Claims Lack Merit*

Finally, the Court also finds no merit to Defendant's claims of ineffective assistance of counsel. In this regard, to establish ineffective assistance of counsel generally,

> a defendant must make two showings. First, he must demonstrate that his counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) [("*Strickland*")]. Second, he must establish that he suffered prejudice—in this context, meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

*Fulton v. Graham*, 802 F.3d 257, 265 (2d Cir. 2015). "In the context of a guilty plea, to show ineffective assistance, the petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, 'he would not have pleaded guilty and would have insisted on going to trial.'" *Phillip v. United States*, 804 F. App'x 91, 93 (2d Cir. 2020)

(quoting *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985)).

Here, the Court finds that Defendant cannot meet either *Strickland* prong. For example, regarding the alleged instances of deficient performance, Defendant primarily asserts that his attorneys pressured him into pleading guilty; failed to properly investigate the alleged tampering with his phone; failed to present arguments to the Court that he wanted them to make; and failed to request a *Franks* hearing based on a BPD investigator's alleged friendship with "people in the local swimming community." However, the contention that counsel pressured Defendant into pleading guilty is directly refuted by Defendant's sworn testimony at the plea hearing, and the theory regarding the need for a *Franks* hearing is completely speculative and unpersuasive.

Defendant's remaining arguments -- that counsel should have made better arguments and performed a better investigation regarding alleged tampering with his phone-- flow from his idiosyncratic insistence that his alleged "predisposition" to think that he was initially texting an adult woman, during the incident that led to BPD investigating him, somehow immunized him from criminal liability for his subsequent conduct. However, counsel's failure to further investigate or file motions in support of that meritless theory is not evidence of ineffective assistance. *See, United States v. Davis*, 122 F.4th 71, 76 (2d Cir. 2024) ("[I]t is well settled that failure to make a meritless argument does not amount to ineffective assistance.") (citation and internal quotation marks omitted); *see also, Mercado v. Lempke*, No. 11 CIV. 6529 SAS, 2015 WL 3879636, at *4 (S.D.N.Y. June 16, 2015) ("Needless to say, however, a lawyer is not obliged to raise every conceivable argument that supports her client's position. This is especially so in the context of frivolous arguments, but it also holds true in the context of nonfrivolous arguments—even nonfrivolous arguments that are explicitly requested by defendant. Put

simply, lawyers must be given latitude to exercise professional judgment.") (footnote omitted).

Nor has Defendant shown prejudice from the alleged errors by counsel, particularly considering the overwhelming evidence of his guilt. *See, e.g.*, *White v. United States*, No. 19-CR-277 (JSR), 2025 WL 2962617, at *3–4 (S.D.N.Y. Oct. 21, 2025 ("[I]n cases of overwhelming guilt, counsel is not likely to violate *Strickland*'s prejudice prong even where clear error can be established.") (citation omitted), *report and recommendation adopted*, No. 19-CR-277-1 (JSR), 2026 WL 221170 (S.D.N.Y. Jan. 28, 2026). In that regard, Defendant's bald assertion that but for counsel's errors he would not have pleaded guilty and instead would have negotiated for a better plea deal is completely at odds with the record and common sense. As the Court noted at the detention hearing, the Government's case on the charge for which Defendant was indicted (Enticement of an Individual under the Age of Eighteen) appeared very strong, and upon conviction would have required a mandatory minimum of ten years in prison. Instead, Foti arranged for Defendant to plead guilty to attempted receipt of child pornography which carried only a five year mandatory minimum. There is no reason whatsoever to think that Defendant's rejection of that deal to pursue further negotiation based on his meritless phone tampering/"predisposition" argument would have been successful.

In sum, having considered all of Defendant's arguments, including any not specifically discussed above, the Court denies the Section 2255 motion as lacking merit.

CONCLUSION

Defendant Lincoln's Section 2255 motion (ECF No. 126) is denied, as are his related meritless and procedurally improper requests for default judgment, ECF Nos. 142-

143.[25] Defendant's motion related to the timing of the filing of his reply (ECF No. 140) is granted *nunc pro tunc*. The Court declines to issue a certificate of appealability since Defendant has not made a substantial showing of the denial of a constitutional right. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure. The Clerk is directed to close the related civil action, 6:24-CV-6104 CJS.

So Ordered.

Dated: Rochester, New York
August 26, 2026

ENTER:

Charles J Siragusa

CHARLES J. SIRAGUSA
United States District Judge

[25] The Government accurately observed that "[t]he basis of the petitioner's motion[s] for a default judgment is his inaccurate claim that the government was obligated to file some sort of sur-reply to his reply within 20 days." ECF No. 144 at p. 3.